# HIROTA *v.* MacARTHUR, GENERAL OF THE ARMY, ET AL.

NO. 239, MISC.

Argued December 16–17, 1948.—Decided December 20, 1948.— Concurring opinion announced June 27, 1949.

*William Logan, Jr., George Yamaoka* and, by special leave of Court, *George A. Furness, pro hac vice,* argued the cause for petitioners.

*David F. Smith* argued the cause for petitioners in Nos. 239 and 240, Misc., and filed a brief for petitioner in No. 239, Misc. *Mr. Yamaoka* was also of counsel for petitioner in No. 239, Misc. *Mr. Logan* and *John G. Brannon* were also of counsel for petitioners in Nos. 239 and 240, Misc.

*John G. Brannon* argued the cause for petitioners in No. 248, Misc. With him on the brief were *John W. Crandall, Mr. Logan, Mr. Yamaoka* and *Mr. Furness. Ben Bruce Blakeney* was also of counsel.

*Solicitor General Perlman* argued the cause for respondents. With him on the brief were *Judge Advocate Gen-*

*eral of the Army Thomas H. Green, Arnold Raum, Robert W. Ginnane, Oscar H. Davis, Beatrice Rosenberg* and *Joseph B. Keenan.*

*Samuel H. Jaffee* filed a brief for the National Lawyers Guild, as *amicus curiae,* opposing the petitions.

PER CURIAM.

The petitioners, all residents and citizens of Japan, are being held in custody pursuant to the judgment of a military tribunal in Japan. Two of the petitioners have been sentenced to death, the others to terms of imprisonment. They filed motions in this Court for leave to file petitions for *habeas corpus.* We set all the motions for hearing on the question of our power to grant the relief prayed and that issue has now been fully presented and argued.

We are satisfied that the tribunal sentencing these petitioners is not a tribunal of the United States. The United States and other allied countries conquered and now occupy and control Japan. General Douglas MacArthur has been selected and is acting as the Supreme Commander for the Allied Powers. The military tribunal sentencing these petitioners has been set up by General MacArthur as the agent of the Allied Powers.

Under the foregoing circumstances the courts of the United States have no power or authority to review, to affirm, set aside or annul the judgments and sentences imposed on these petitioners and for this reason the motions for leave to file petitions for writs of *habeas corpus* are denied.

MR. JUSTICE MURPHY dissents.

MR. JUSTICE RUTLEDGE reserves decision and the announcement of his vote until a later time.*

---

*MR. JUSTICE RUTLEDGE died September 10, 1949, without having announced his vote on this case.

MR. JUSTICE JACKSON took no part in the final decision on these motions.

MR. JUSTICE DOUGLAS, concurring.*

These cases present new, important and difficult problems.

Petitioners are citizens of Japan. They were all high officials of the Japanese Government or officers of the Japanese Army during World War II. They are held in custody pursuant to a judgment of the International Military Tribunal for the Far East. They were found guilty by that tribunal of various so-called war crimes against humanity.

Petitioners at the time of argument of these cases were confined in Tokyo, Japan, under the custody of respondent Walker, Commanding General of the United States Eighth Army, who held them pursuant to the orders of respondent MacArthur, Supreme Commander for the Allied Powers. Other respondents are the Chief of Staff of the United States Army, the Secretary of the Department of the Army, and the Secretary of Defense.

*First.* There is an important question of jurisdiction that lies at the threshold of these cases. Respondents contend that the Court is without power to issue a writ of *habeas corpus* in these cases. It is argued that the Court has no original jurisdiction as defined in Art. III, § 2, Cl. 2 of the Constitution,[1] since these are not cases

---

*These motions were argued December 16 and 17, 1948 and the opinion of the Court handed down December 20, 1948. I was not able within that short time to reduce my views to writing. Hence I concurred in the result "for reasons to be stated in an opinion."

[1] Article III, § 2, Cl. 2 reads as follows:

"In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before

affecting an ambassador, public minister, or consul; nor is a State a party. And it is urged that appellate jurisdiction is absent (1) because military commissions do not exercise judicial power within the meaning of Art. III, § 2 of the Constitution and hence are not agencies whose judgments are subject to review by the Court; and (2) no court of the United States to which the potential appellate jurisdiction of this Court extends has jurisdiction over this cause.

It is to the latter contention alone that consideration need be given. I think it is plain that a District Court of the United States does have jurisdiction to entertain petitions for *habeas corpus* to examine into the cause of the restraint of liberty of the petitioners.

The question now presented was expressly reserved in *Ahrens* v. *Clark,* 335 U. S. 188, 192, note 4. In that case aliens detained at Ellis Island sought to challenge by *habeas corpus* the legality of their detention in the District Court for the District of Columbia. It was argued that that court had jurisdiction because the Attorney General, who was responsible for their custody, was present there. We rejected that view, holding that it was the District Court where petitioners were confined that had jurisdiction to issue the writ. It is now argued that no District Court can act in these cases because if in one case their jurisdiction under the *habeas corpus* statute [2] is limited to inquiries into the causes of restraints

---

mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make."

[2] 28 U. S. C. § 2241 (a) provides:

"Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. The order of a circuit judge shall be entered in the records of the district court of the district wherein the restraint complained of is had."

of liberty of those confined within the territorial juris-
dictions of those courts, it is so limited in any other.

That result, however, does not follow. In *Ahrens* v.
*Clark, supra,* we were dealing with the distribution of
judicial power among the several District Courts. There
was an explicit legislative history, indicating disapproval
of a practice of moving prisoners from one district to
another in order to grant them the hearings to which
they are entitled. We held that the court at the place
of confinement was the court to which application must
be made. But it does not follow that, where that place
is not within the territorial jurisdiction of any Dis-
trict Court, judicial power to issue the writ is rendered
impotent.

*Habeas corpus* is an historic writ and one of the basic
safeguards of personal liberty. See *Bowen* v. *Johnston,*
306 U. S. 19, 26. There is no room for niggardly re-
strictions when questions relating to its availability are
raised. The statutes governing its use must be gener-
ously construed if the great office of the writ is not to
be impaired. In *Ahrens* v. *Clark, supra,* denial of a
remedy in one District Court was not a denial of a remedy
in all of them. There was a District Court to which
those petitioners could resort. But in these cases there
is none if the jurisdiction of the District Court is in all
respects restricted to cases of prisoners who are confined
within their geographical boundaries.

Such a holding would have grave and alarming conse-
quences. Today Japanese war lords appeal to the Court
for application of American standards of justice. Tomor-
row or next year an American citizen may stand con-
demned in Germany or Japan by a military court or
commission.[3] If no United States court can inquire into

___

[3] Cases of this sort are beginning to appear. *In re Bush,* 336
U. S. 971, is such a case. Petitioner was a civilian employee of
the War Department from Feb. 19, 1946 to Dec. 28, 1947, and

the lawfulness of his detention, the military have acquired, contrary to our traditions (see *Ex parte Quirin*, 317 U. S. 1; *In re Yamashita*, 327 U. S. 1), a new and alarming hold on us.

I cannot agree to such a grave and startling result. It has never been deemed essential that the prisoner in every case be within the territorial limits of the district where he seeks relief by way of *habeas corpus*. In *Ex parte Endo*, 323 U. S. 283, 304–306, a prisoner had been removed, pending an appeal, from the district where the petition had been filed. We held that the District Court might act if there was a respondent within reach of its process who had custody of the prisoner. The aim of the statute is the practical administration of justice. The allocation of jurisdiction among the District Courts, recognized in *Ahrens* v. *Clark*, is a problem of judicial administration, not a method of contracting the authority of the courts so as to delimit their power to issue the historic writ.

The place to try the issues of this case is in the district where there is a respondent who is responsible for the custody of petitioners. That district is obviously the District of Columbia. That result was reached by the Court of Appeals for the District of Columbia in *Eisentrager* v. *Forrestal*, 84 U. S. App. D. C. 396, 174 F. 2d 961.

---

was stationed in Japan for most of that period. He terminated his employment and returned to this country. Thereafter, he was en route to Siam when his plane landed in Japan. He was arrested and tried by a General Provost Court sitting in Japan for trading American goods to a Japanese for certain emoluments. He was convicted and sentenced to one year imprisonment and fined 75,000 yen. On May 9, 1949, we denied his motion for leave to file a petition for *habeas corpus* "without prejudice to the right to apply to any appropriate court that may have jurisdiction."

For a somewhat comparable case from Germany see *Bird* v. *Johnson*, 336 U. S. 950, where we denied motions for leave to file petitions for writs of *habeas corpus* on April 18, 1949.

It held, in the case of a German national confined in Germany in the custody of the United States Army, that the court having jurisdiction over those who have directive power over the jailer outside the United States could issue the writ. In my view that is the correct result. For we would have to conclude that the United States Generals who have custody of petitioners are bigger than our government to hold that the respondent-officials of the War Department have no control or command over them. That result would raise grave constitutional questions, as *Eisentrager* v. *Forrestal, supra,* suggests.

It is therefore clear to me that the District Court of the District of Columbia is the court to hear these motions. The appropriate course would be to remit the parties to it, reserving any further questions until the cases come here by certiorari. But the Court is unwilling to take that course, apparently because it deems the cases so pressing and the issues so unsubstantial that the motions should be summarily disposed of.

*Second.* The Court in denying leave to file states:

"We are satisfied that the tribunal sentencing these petitioners is not a tribunal of the United States. The United States and other allied countries conquered and now occupy and control Japan. General Douglas MacArthur has been selected and is acting as the Supreme Commander for the Allied Powers. The military tribunal sentencing these petitioners has been set up by General MacArthur as the agent of the Allied Powers.

"Under the foregoing circumstances the courts of the United States have no power or authority to review, to affirm, set aside or annul the judgments and sentences imposed on these petitioners . . . ."

But that statement does not in my opinion adequately analyze the problem. The formula which it evolves to dispose of the cases is indeed potentially dangerous. It

leaves practically no room for judicial scrutiny of this new type of military tribunal which is evolving. It leaves the power of those tribunals absolute. Prisoners held under its mandates may have appeal to the conscience or mercy of an executive; but they apparently have no appeal to law.

The fact that the tribunal has been set up by the Allied Powers should not of itself preclude our inquiry. Our inquiry is directed not to the conduct of the Allied Powers but to the conduct of our own officials. Our writ would run not to an official of an Allied Power but to our own official. We would want to know not what authority our Allies had to do what they did but what authority our officials had.

If an American General holds a prisoner, our process can reach him wherever he is. To that extent at least, the Constitution follows the flag. It is no defense for him to say that he acts for the Allied Powers. He is an American citizen who is performing functions for our government. It is our Constitution which he supports and defends. If there is evasion or violation of its obligations, it is no defense that he acts for another nation. There is at present no group or confederation to which an official of this Nation owes a higher obligation than he owes to us.

I assume that we have no authority to review the judgment of an international tribunal. But if as a result of unlawful action, one of our Generals holds a prisoner in his custody, the writ of *habeas corpus* can effect a release from that custody. It is the historic function of the writ to examine into the cause of restraint of liberty. We should not allow that inquiry to be thwarted merely because the jailer acts not only for the United States but for other nations as well.

Let me illustrate the gravity and seriousness of the conclusion of the Court.

(1) Suppose an American citizen collaborated with petitioners in plotting a war against the United States. The laws of the United States provide severe penalties for such conduct. May that citizen be tried and convicted by an international tribunal and have no access to our courts to challenge the legality of the action of our representatives on it? May he, in the face of the safeguards which our Constitution provides even for traitors, have no protection against American action against him?

(2) Suppose an American citizen on a visit to Japan during the occupation commits murder, embezzlement, or the like. May he be tried by an international tribunal and have no recourse to our courts to challenge its jurisdiction over him?

(3) What about any other civilian so tried and convicted for such a crime committed during the occupation?

These are increasingly important questions as collaboration among nations at the international level continues. They pose questions for which there is no precedent. But we sacrifice principle when we stop our inquiry once we ascertain that the tribunal is international.

I cannot believe that we would adhere to that formula if these petitioners were American citizens. I cannot believe we would adhere to it if this tribunal or some other tribunal were trying American citizens for offenses committed either before or during the occupation. In those cases we would, I feel, look beyond the character of the tribunal to the persons being tried and the offenses with which they were charged. We would ascertain whether, so far as American participation is concerned, there was authority to try the defendants for the precise crimes with which they are charged. That is what we should do here.

(1) General Douglas MacArthur is the Supreme Commander for the Allied Powers. The Potsdam Declaration (July 26, 1945) provided for occupation of Japan

by the Allies. The Instrument of Surrender (September 2, 1945) accepted the terms of the Potsdam Declaration. By the Moscow Agreement (December 27, 1945) the Supreme Commander was recognized as "the sole executive authority for the Allied Powers in Japan." It also established a Far Eastern Commission composed of representatives of eleven nations. It was vested with broad powers (a) to formulate policies, principles and standards by which Japan will fulfill its obligations under the Terms of Surrender and (b) to review directives issued to the Supreme Commander or any action taken by him involving policy decisions within its jurisdiction. All directives embodying policy decisions of the Commission are to be prepared by the United States and it transmits them to the Supreme Commander.[4] And the Commission is enjoined to respect "the chain of command from the United States Government to the Supreme Commander and the Supreme Commander's command of occupation forces."

The war crimes policy of the Allied Powers as respects Japan seems to have been first suggested in the Cairo Declaration [5] (December 1, 1943). The Potsdam Declaration promised that "stern justice" would be meted out "to all war criminals."

The Far Eastern Commission on April 3, 1946, adopted a policy decision which defined "war crimes" as including "Planning, preparation, initiation or waging of a war of

---

[4] The Moscow Agreement also provided:

"The United States Government may issue interim directives to the Supreme Commander pending action by the Commission whenever urgent matters arise not covered by policies already formulated by the Commission; provided that any directives dealing with fundamental changes in the Japanese constitutional structure or in the regime of control, or dealing with a change in the Japanese Government as a whole will be issued only following consultation and following the attainment of agreement in the Far Eastern Commission."

[5] "The Three Great Allies are fighting this war to restrain and punish the aggression of Japan."

aggression or a war in violation of international treaties, agreements and assurances, or participation in a common plan or conspiracy for the accomplishment of any of the foregoing." It provided that the Supreme Commander for the Allied Powers should have power to appoint special international military courts to try war criminals. Prior to this time the Supreme Commander had constituted a court for that purpose and had appointed judges from various nations to it. On receipt of the directive based on the Commission's war crimes policy decision he provided a new court—the one before which petitioners were tried. To this court the Supreme Commander appointed from names submitted by the respective nations eleven judges—one each from the United States, China, United Kingdom, Russia, Australia, Canada, France, The Netherlands, New Zealand, India, and the Philippines.

So I think there can be no serious doubt that, though the arrangement is in many respects amorphous and though the tribunal is dominated by American influence, it is nonetheless international in character. But it should be noted that the chain of command from the United States to the Supreme Commander is unbroken. It is he who has custody of petitioners. It is through that chain of command that the writ of *habeas corpus* can reach the Supreme Commander.

(2) The Constitution gives Congress the power to define and punish "Offences against the Law of Nations . . . ." Art. I, § 8, Cl. 10. It is argued that Congress here has not made aggressive war a crime nor provided individual punishment for waging it. It is therefore argued that these petitioners cannot be tried by United States officials for any such crime. We do not need to consider a case where the definition given by Congress conflicts with what a President does. There is no conflict here. The grant of power to the Congress does not necessarily preclude exercise of authority by the President. The Constitution

makes the President the "Commander in Chief of the Army and Navy of the United States . . . ." Art. II, § 2, Cl. 1. His power as such is vastly greater than that of troop commander. He not only has full power to repel and defeat the enemy; he has the power to occupy the conquered country (*New Orleans* v. *Steamship Co.,* 20 Wall. 387, 394) and to punish those enemies who violated the law of war. *Ex parte Quirin, supra,* at 28–29; *In re Yamashita, supra,* at 10–11. We need not consider to what extent, if any, the President, in providing that justice be meted out to a defeated enemy, would have to follow (as he did in *Ex parte Quirin, supra,* and *In re Yamashita, supra*) the procedure that Congress had prescribed for such cases. Here the President did not utilize the conventional military tribunals provided for by the Articles of War. He did not act alone but only in conjunction with the Allied Powers. This tribunal was an international one arranged for through negotiation with the Allied Powers.

The President is the sole organ of the United States in the field of foreign relations. See *United States* v. *Curtiss-Wright Corp.,* 299 U. S. 304, 318–321. Agreements which he has made with our Allies in furtherance of our war efforts have been legion. Whether they are wise or unwise, necessary or improvident, are political questions, not justiciable ones. That is particularly true of questions relating to the commencement and conduct of the war. Agreement with foreign nations for the punishment of war criminals, insofar as it involves aliens who are the officials of the enemy or members of its armed services, is a part of the prosecution of the war. It is a furtherance of the hostilities directed to a dilution of enemy power and involving retribution for wrongs done. It falls as clearly in the realm of political decisions as all other aspects of military alliances in furtherance of the common objective of victory. Cf. *Georgia* v. *Stanton,* 6 Wall. 50, 71.

After the escape of Napoleon from Elba where he had voluntarily retired, he was by agreement among the Powers entrusted to the custody of Great Britain. Then followed his banishment to St. Helena. I have no doubt that our President could have done the same as respects these petitioners. Or he could have made arrangements with other nations for their custody and detention. When the President moves to make arrangements with other nations for their trial, he acts in a political role on a military matter. His discretion cannot be reviewed by the judiciary.

The political nature of the decision which brought these petitioners before the International Military Tribunal is emphasized by the rulings which that tribunal made. The Charter of the Tribunal was constituted by an order of the Supreme Commander. It established the tribunal, determined its procedure, and described its jurisdiction. It described the "crimes" that came within the jurisdiction of the tribunal [6] and the standard of responsibility of the accused.[7]

---

[6] Article 5 provided:

"The Tribunal shall have the power to try and punish Far Eastern war criminals who as individuals or as members of organizations are charged with offenses which include Crimes against Peace. The following acts, or any of them, are crimes coming within the jurisdiction of the Tribunal for which there shall be individual responsibility:

"a. *Crimes against Peace:* Namely, the planning, preparation, initiation or waging of a declared or undeclared war of aggression, or a war in violation of international law, treaties, agreements or assurances, or participation in a common plan or conspiracy for the accomplishment of any of the foregoing;

"b. *Conventional War Crimes:* Namely, violations of the laws or customs of war;

"c. *Crimes against Humanity:* Namely, murder, extermination, enslavement, deportation, and other inhumane acts committed before or during the war, or persecutions on political or racial grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated. Leaders, organizers, instigators

Justice Pal of India, who dissented from the judgments of conviction, claimed that the Allied Powers as victors did not have the legal right under international law to treat petitioners as war criminals. He wrote at length, contending that the Pact of Paris,[8] 46 Stat. 2343, to which Japan was a signatory, did not affect the pre-

---

and accomplices participating in the formulation or execution of a common plan or conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any person in execution of such plan."

Petitioners Dohihara, Hirota, Kido, Oka, Sato, Shimada and Togo were found guilty of waging a war of aggression and of conspiring to do so. Petitioners Dohihara and Hirota were found guilty of conventional war crimes and crimes against humanity.

[7] Article 6 provided:

"Neither the official position, at any time, of an accused, nor the fact that an accused acted pursuant to order of his government or of a superior shall, of itself, be sufficient to free such accused from responsibility for any crime with which he is charged, but such circumstances may be considered in mitigation of punishment if the Tribunal determines that justice so requires."

[8] This treaty provided in part:

"Persuaded that the time has come when a frank renunciation of war as an instrument of national policy should be made to the end that the peaceful and friendly relations now existing between their peoples may be perpetuated;

. . . . .

"ARTICLE I

"The High Contracting Parties solemnly declare in the names of their respective peoples that they condemn recourse to war for the solution of international controversies, and renounce it as an instrument of national policy in their relations with one another.

"ARTICLE II

"The High Contracting Parties agree that the settlement or solution of all disputes or conflicts of whatever nature or of whatever origin they may be, which may arise among them, shall never be sought except by pacific means."

See Miller, The Peace Pact of Paris (1928).

existing legal position of war in international life.[9] He rejected the argument that international customary law had developed under the Pact,[10] or that there was individual responsibility for the waging of aggressive war, even assuming it to be a crime under international law.[11]

He called on the Tribunal to rule on these questions. He stated:

> "We have been set up as an International Military Tribunal. The clear intention is that we are to be 'a judicial tribunal' and not 'a manifestation of power'. The intention is that we are to act as a court of law and act under international law. We are to find out, by the application of the appropriate rules of inter-

---

[9] For discussions *pro* and *con* on this issue see Glueck, War Criminals (1944); Glueck, The Nuremberg Trial and Aggressive War (1946).

[10] In this connection he said:

"I may mention here in passing that within four years of the conclusion of the Pact there occurred three instances of recourse to force on a large scale on the part of the signatories of the Pact. In 1929 Soviet Russia conducted hostilities against China in connection with the dispute concerning the Chinese Eastern Railway. The occupation of Manchuria by Japan in 1931 and 1932 followed. Then there was the invasion of the Colombian Province of Leticia by Peru in 1932. Thereafter, we had the invasion of Abyssinia by Italy in 1935 and of Finland by Russia in 1939. Of course there was also the invasion of China by Japan in 1937."

Some of the petitioners, notably Dohihara, Hirota, Kido and Togo, were found guilty on charges which involved waging of aggressive war prior to Pearl Harbor, *e. g.*, in connection with the Manchurian episode.

[11] He went so far as to say:

"In my view if the alleged acts do not constitute any crime under the existing international law, the trial and punishment of the authors thereof *with a new definition of crime* given by the victor would make it a 'war crime' on his part. The prisoners are to be dealt with according to the rules and regulations of international law and not according to what the victor chooses to name as international law."

national law, whether the acts constitute any crime under the already existing law, *dehors* the Declaration, the Agreement or, the Charter. Even if the Charter, the Agreement or the Declaration schedules them as crimes, it would only be the decision of the relevant authorities that they are crimes under the already existing law. But the Tribunal must come to its own decision. It was never intended to bind the Tribunal by the decision of these bodies, for otherwise the Tribunal will not be a 'judicial tribunal' but a mere tool for the manifestation of power.

"The so-called trial held according to the definition of crime *now* given by the victors obliterates the centuries of civilization which stretch between us and the summary slaying of the defeated in a war. A trial with law thus prescribed will only be a sham employment of legal process for the satisfaction of a thirst for revenge. It does not correspond to any idea of justice. Such a trial may justly create the feeling that the setting up of a tribunal like the present is much more a political than a legal affair, an essentially political objective having thus been cloaked by a juridical appearance. Formalized vengence [*sic*] can bring only an ephemeral satisfaction, with every probability of ultimate regret; but vindication of law through *genuine legal process* alone may contribute substantially to the re-establishment of order and decency in international relations."

But the Tribunal, though expressing disagreement with Justice Pal on the point,[12] did not rule on the question.

---

[12] It stated in this connection that it was in complete accord with the following passages from the opinion of the Nuremberg Tribunal, Nazi Conspiracy and Aggression, Opinion and Judgment (1947), pp. 48, 50, 53, 49, 53–54:

"The Charter is not an arbitrary exercise of power on the part of the victorious nations, but in the view of the Tribunal, as will be

It ruled that "the law of the Charter is decisive and binding" upon it. It said:

"This is a special tribunal set up by the Supreme Commander under authority conferred on him by the

shown, it is the expression of international law existing at the time of its creation;

. . . . .

"The question is, what was the legal effect of this pact? [Pact of Paris.] The nations who signed the pact or adhered to it unconditionally condemned recourse to war for the future as an instrument of policy, and expressly renounced it. After the signing of the pact, any nation resorting to war as an instrument of national policy breaks the pact. In the opinion of the Tribunal, the solemn renunciation of war as an instrument of national policy necessarily involves the proposition that such a war is illegal in international law; and that those who plan and wage such a war, with its inevitable and terrible consequences, are committing a crime in so doing.

. . . . .

"The principle of international law, which under certain circumstances, protects the representatives of a State, cannot be applied to acts which are condemned as criminal by international law. The authors of these acts cannot shelter themselves behind their official position in order to be freed from punishment in appropriate proceedings.

. . . . .

". . . the maxim *nullum crimen sine lege* is not a limitation of sovereignty, but is in general a principle of justice. To assert that it is unjust to punish those who in defiance of treaties and assurances have attacked neighboring states without warning is obviously untrue, for in such circumstances the attacker must know that he is doing wrong, and so far from it being unjust to punish him, it would be unjust if his wrong were allowed to go unpunished.

. . . . .

"The Charter specifically provides in Article 8:

" 'The fact that the defendant acted pursuant to order of his Government or of a superior shall not free him from responsibility, but may be considered in mitigation of punishment.'

"The provisions of this Article are in conformity with the law of all

Allied Powers. It derives its jurisdiction from the Charter. In this trial its members have no jurisdiction except such as is to be found in the Charter. The Order of the Supreme Commander, which appointed the members of the Tribunal, states: 'The responsibilities, powers, and duties of the members of the Tribunal are set forth in the Charter thereof . . .' In the result, the members of the Tribunal, being otherwise wholly without power in respect to the trial of the accused, have been empowered by the documents, which constituted the Tribunal and appointed them as members, to try the accused but subject always to the duty and responsibility of applying to the trial the law set forth in the Charter."

The President of the Tribunal, Sir William Flood Webb of Australia, in a separate opinion stated:

"The Charter is binding as it is International Law, the Potsdam Declaration and the Instrument of Surrender put into operation by the martial law of the Supreme Commander of the Allied Powers in occupation of Japan.

"The Supreme Commander stated in his proclamation of the Tribunal and Charter—the martial law referred to—that he acted in order to implement the term of surrender that stern justice should be meted out to war criminals.

. . . . .

"Under International Law belligerents have the right to punish during the war such war criminals as fall into their hands. The right accrues after occu-

---

nations. . . . The true test, which is found in varying degrees in the criminal law of most nations, is not the existence of the order, but whether moral choice was in fact possible."

pation of the enemy territory. As a condition of the armistice a victorious belligerent may require the defeated state to hand over persons accused of war crimes. The Potsdam Declaration and the Instrument of Surrender contemplate the exercise of this right. But guilt must be ascertained before punishment is imposed; hence the provision for trials.

"The occupying belligerent may set up military courts to try persons accused of war crimes; and to assure a fair trial may provide among other things for civilian judges, the right of appeal, and publicity. (Oppenheim on *International Law,* 6th Edn. Vol. II, p. 456.)" [13]

The conclusion is therefore plain that the Tokyo Tribunal acted as an instrument of military power of the Executive Branch of government. It responded to the will of the Supreme Commander as expressed in the military order by which he constituted it. It took its law from its creator and did not act as a free and independent tribunal to adjudge the rights of petitioners under international law. As Justice Pal said, it did not therefore sit as a judicial tribunal. It was solely an instrument of political power. Insofar as American participation is concerned, there is no constitutional objection to that action. For the capture and control of those who were responsible for the Pearl Harbor incident was a political question on which the President as Commander-in-Chief, and as spokesman for the nation in foreign affairs, had the final say.

---

[13] He went on to state his view that the waging of aggressive war was a crime under international law and that individual responsibility attached thereto. Justice Jaranilla of the Philippines filed a separate concurring opinion to the same effect. Justice Bernard of France, though dissenting from the majority because of certain rulings on vicarious criminal responsibility and because he thought the trial was not fair, agreed that the waging of aggressive war was a crime.