**LAKE ONTARIO LAND DEVELOP-
MENT & BEACH PROTECTION
ASS'N, Inc.**

**v.**

**FEDERAL POWER COMMISSION.**

**PUBLIC POWER & WATER CORP.**

**v.**

**FEDERAL POWER COMMISSION.**

**CENTRAL PENNSYLVANIA COAL
PRODUCERS' ASS'N**

**v.**

**FEDERAL POWER COMMISSION.**

Nos. 11997–11999.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 23, 1953.

Decided Jan. 29, 1954.

Petition for Rehearing in Banc in
No. 11997 Denied Feb. 18, 1954.

Petition for Rehearing in Banc in
No. 11999 Denied Feb. 16, 1954.

Writ of Certiorari Denied

June 7, 1954.

See 74 S.Ct. 871.

230

Mr. Clayton L. Burwell, Washington, D. C., for petitioner Lake Ontario Land Development & Beach Protection Ass'n, Inc.

Mr. Orrin G. Judd, of the Bar of the Court of Appeals of New York, New York City, pro hac vice, by special leave of Court, with whom Acting Sol. Gen. Robert L. Stern, Mr. Willard W. Gatchell, Gen. Counsel, Federal Power Commission, and Mr. Charles M. Goetz, Washington, D. C., were on the joint brief, for respondent Federal Power Commission and intervenor Power Authority of the State of New York, in No. 11997.

Mr. John H. Coffman, Washington, D. C., for petitioner Public Power and Water Corporation.

Mr. Willard W. Gatchell, Gen. Counsel, Federal Power Commission, Wash-

ington, D. C., with whom Acting Sol. Gen. Robert L. Stern, Mr. Louis C. Kaplan, Attorney, Federal Power Commission, and Mr. Charles M. Goetz, Washington, D. C., were on the joint brief, for respondent Federal Power Commission and intervenor Power Authority of the State of New York, in No. 11998.

Mr. Walter Freedman, Washington, D. C., with whom Messrs. Arnold Levy and Jack Werner, Washington, D. C., were on the brief, for petitioner Central Pennsylvania Coal Producers' Ass'n.

Acting Sol. Gen. Robert L. Stern, Washington, D. C., with whom Mr. Willard W. Gatchell, Gen. Counsel, Federal Power Commission, Mr. Louis C. Kaplan, Atty., Federal Power Commission, and Mr. Charles M. Goetz, Washington, D. C., were on the joint brief, for respondent Federal Power Commission and intervenor Power Authority of the State of New York, in No. 11999.

Mr. Murray Preston, Washington, D. C., for intervenor Great Lakes-St. Lawrence Ass'n, in Nos. 11997, 11998 and 11999.

Before EDGERTON, PRETTYMAN and DANAHER, Circuit Judges.

PRETTYMAN, Circuit Judge.

The Federal Power Commission granted a license to the Power Authority of the State of New York, an agency of the State,[1] to build and operate power facilities to be located in the International Rapids Section of the St. Lawrence River on the United States side of the International Boundary. These proposed facilities include the Long Sault Dam, located at the upstream end of Barnhart Island; that part of the powerhouse-dam extending from the downstream end of Barnhart Island to its intersection with the International Boundary in the main channel of the St. Lawrence River; and

that portion of the Iroquois Dam which lies on the United States side of the Boundary.

Section 4(e) of the Federal Power Act[2] provides in pertinent part that the Commission is authorized and empowered "To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized under the laws of the United States or any State thereof, or to any State or municipality for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States * * * ."

■ The language of this section is obviously broad. Of particular interest in the present controversy are two features. (1) The section authorizes licenses not only to citizens and corporations but specifically to any "municipality", and elsewhere[3] the Act defines "municipality" to include an agency of a State. (2) The section authorizes licenses for facilities across, along, from, or in any water over which Congress has jurisdiction under the commerce clause of the Constitution. The St. Lawrence River on the United States side of the Boundary is water over which Congress has jurisdiction, and so power facilities along or in that water fall squarely within the words of the section.

The legislative history of the Act demonstrates that the Congress fully realized the licensing authority included authority over projects in international boundary streams. We need not discuss these various references in detail; they may

1. Created by the Power Authority Act, Laws of N.Y. c. 772 (1931), amended by Laws of N.Y. c. 146 (1951), Public Authorities Law, § 1001 et seq., McK. Consol.Laws, c. 43–A.

2. 41 Stat. 1065 (1920), as amended, 16 U.S.C.A. § 797(e).

3. Section 3(7), 41 Stat. 1063 (1920), 49 Stat. 838 (1935), 16 U.S.C.A. § 796(7).

be found at the places indicated in the footnote.[4] Particularly pertinent is the provision in an Act approved August 15, 1953,[5] which amended Section 14 of the Federal Power Act[6] and contained this provision: " * * * except that the provisions of section 14 and section 4(b) shall continue to be applicable to any license issued for a hydroelectric development in the International Rapids section of the Saint Lawrence River." This clause clearly shows Congress had in mind the license under consideration, which had been issued July 15, 1953.

■ Petitioners' contentions rest in large part upon the erroneous premise that the Power Commission licenses projects as such. The Federal Power Act is not cast in that form. The Commission licenses facilities—dams, powerhouses, transmission lines, and other "project works" of various sorts—not projects as such. Care must be taken in any consideration of this statute lest an inadvertent shifting of the terms "project" (which is a whole development)[7] and "project works" (which are structures)[8] cause confusion.

■ Petitioners say then that the Act authorizes the licensing of facilities but not of parts of facilities. They say that the Commission can license a dam but not half a dam. But the argument falls when other facilities listed, along with "dams", in the same sentence in the Act[9] are considered. For example, the statute authorizes the Commission to license "power houses". Surely the Commission is thereby authorized to license a powerhouse of which only one-half the contemplated capacity has been or is initially to be completed. Of course, the Commission may decline, and has repeatedly refused, to license a structure which is part only of a project, but our question is not whether it may refuse but whether it must. Again, the word "dam" does not necessarily mean a structure all the way across a stream although it usually has that meaning. A dam is a barrier, the dictionaries say. A structure built out into a stream, which stops the water as far as it goes, and particularly if it puts the impeded water to work, is a dam. Types of construction come easily to mind in which a barrier built only partway across the shore-to-shore span of a stream might be a useful facility. Moreover a structure in water need not be a dam to be licensed under the Act. According to the statutory definitions, "project works" include all the physical structures of a project, and "project" includes not only named types of structures, such as dams, but also "all miscellaneous structures used and useful in connection with said unit".[10] Even half a dam would be a miscellaneous structure. Petitioners say that the Act authorizes the license of facilities "across" streams. But the Act also authorizes the license of facilities "in" streams.

The answer is made clear if we assume a case in which one private concern seeks to build a whole project across an international stream, making its own arrangements with the governments involved. It would have to have licenses. Surely an agency of the United States could issue the license for the structures in United States territory. The fact that such structures would constitute only part of the project, or only part of a completed structure, could not make Government licensing impossible.

■ Petitioners contend that, since completion of the project requires the construction of facilities on the Canadian side of the river and thus requires a compact or agreement with the Canadian

4. 56 Cong.Rec. 9768-69; 58 Cong.Rec. 2027, 2034; 59 Cong.Rec. 1101, 1483, 1492-95.

5. Pub.L.No.278, 83d Cong., 1st Sess., 16 U.S.C.A. § 828 et seq.

6. 41 Stat. 1071 (1920), 49 Stat. 844 (1935), 16 U.S.C.A. § 807.

7. 41 Stat. 1064 (1920), 16 U.S.C.A. § 796 (11).

8. 41 Stat. 1064 (1920), 16 U.S.C.A. § 796 (12).

9. Supra note 2.

10. See note 7, supra.

government, and since the Power Authority is an instrumentality of the State of New York, the arrangement is in violation of the Constitution, because Congress alone may regulate foreign commerce and the States, without the consent of Congress, are specifically forbidden to make international compacts or agreements.[11] But we are not shown that the State of New York, or its agency, the New York Power Authority, has made or intends to make any agreement with Canada. Rather, the Government of the United States and the Government of Canada each submitted an application to the International Joint Commission. Through such actions and otherwise, the international arrangements involved in the project were perfected, and thereafter the applications were considered and approved by that Commission. The Joint Commission was created jointly by Canada and the United States under the Boundary Waters Treaty of 1909.[12] Petitioners say this Commission lacked jurisdiction to act upon the joint application of the two governments and that therefore its Order of Approval was a nullity. But the Joint Commission is not before the court, and no review is sought of its order, even if that order were subject to judicial review, as to which point there is at least considerable doubt.[13] The sole matter before the court is the license granted by the Federal Power Commission.

 Petitioners urge that a license for facilities designed and located as these are must as a matter of Constitutional necessity be approved by Congress itself. We are shown no reason why the authority to license structures in United States territory could not be delegated, and, as we have seen, such authority was delegated in the Federal Power Act. That antecedent or concomitant arrangements for the order here challenged

were international in character and so were managed by other means, based on treaty, presents no defect in the validity of the licensing authority for local structures. Domestic operations stemming from domestic law certainly lose none of their effectiveness because treaties may have dealt with the same or broader subject matter. Indeed a treaty may provide cogency for domestic measures to implement its objectives.

 It is argued that the provisions of Section 14 of the Federal Power Act preclude the possibility that the Commission could license facilities which are part only of a project partly inside and partly outside the United States. This section, 14, provides that in certain events the United States shall have the right to take over any project "covered in whole or in part by the license". It is said that unless the United States is able to take over the *whole* project—not just the facilities licensed but the "complete unit of improvement or development," [14]—the section would be inoperative. This means, the argument is, that this statute does not contemplate a license for facilities in a project which could be recaptured only in part by the United States, the remaining part of the project being outside the power of the United States to take; and that therefore this sort of situation was left out of the licensing authority of the statute and in the sole control of Congress. But there are two answers to this argument. In the first place, the amendatory act of August 15, 1953,[15] specifically provides that Section 14, the section we are discussing, shall continue to apply "to any license issued for a hydroelectric development in the International Rapids section of the Saint Lawrence River." This language does not permit a contention that Congress did not know a license might be issued under the Act for a de-

---

11. U.S.Const. art. I, § 10, cl. 3.

12. 36 Stat. 2448.

13. Koki Hirota v. General of the Army MacArthur, 1948, 338 U.S. 197, 69 S.Ct. 1238, 93 L.Ed. 1902.

14. Definition of "project" in Section 3(11), *supra* note 7.

15. *Supra* note 5.

velopment in this international boundary stream. Since Congress knew that fact, it must have realized such a development would include facilities across the boundary which is in the middle of the stream. It had known for many years the contemplated engineering details of the development. Indeed, as we have already indicated, when Congress used that language (August 15, 1953), the order here under attack, granting the license, had already been issued (July 15, 1953).

■ In the second place, although the recapture provision, Section 14, is a term or condition imposed upon all licenses, there is nothing to indicate that it was intended to be or is a limitation upon the scope of the licensing power under Section 4(e). Generally speaking, the recapture provision applies to the whole of a project in which some or all of the project works are licensed, but, if circumstances are such that the full scope of both the licensing and the recapture provisions cannot be made to fit, one provision does not nullify the other; both apply to the fullest practicable extent. In such a case the license would be valid and the recapture provision would be applied to the extent possible.

[17] The application of Section 14 to this project is clear. The section means that the United States shall have the right to take over the whole of the project so far as it has jurisdiction to take it over. The section clearly contemplates the taking over of property of the licensee, but not any other property. The detailed provisions in this section and in the following section make this meaning clear. Moreover, as we have pointed out, the amendatory act of 1953 specifically directs that the recapture section shall apply to any license issued by the Federal Power Commission for this particular development. The only way the United States could take over the project of its licensee under a license issued by the United States or its agent for a hydroelectric development in the St. Lawrence River, would be for it to take over the facilities on the United States side of the stream, and no more.

What Section 14 means, therefore, when applied to the project as covered in part by this license, is that the United States has the right, in the events described in the section, to take over its licensee's property involved in the development.

The Federal Power Commission clearly—and correctly—so interpreted the statute. In its July 15th order granting the license, Article 17 provided in pertinent part:

"* * * In the event the project is taken over by the United States upon the termination of the license, as provided in Section 14 of the Act, or is transferred to a new licensee under the provisions of Section 15 of the Act, the Licensee, its successors and assigns, will be responsible for and will make good any defect of title to or of right of user in any of such project property which is necessary or appropriate or valuable and serviceable in the maintenance and operation of the project, and will pay and discharge, or will assume responsibility for payment and discharge, of all liens or incumbrances upon the project or project property created by the Licensee or created or incurred after the issuance of the license: * * *"

Moreover, the Federal Power Commission had before it the record of all procedures which had been followed preliminary to the application of the Power Authority. It certainly must have been aware that the Government of the United States, in its application of June 30, 1952, to the International Joint Commission, in paragraph 12, had specified certain reservations to attach to the license and to bind the licensee. It was therein provided that:

"* * * This application is submitted with the understanding that approval thereof by the International Joint Commission will not relieve any entity which may be authorized to construct or operate the United States part of the project from compliance with valid laws of the Unit-

ed States, now in force or hereafter enacted by the Congress, or with regulations now in force or hereafter issued by the Federal Power Commission, applicable to the development and utilization of the United States' share of the waters of the International Rapids section of the St. Lawrence River."

Again, in paragraph 14 of its application, the United States Government left open the door for supersession through possible later Congressional action and for the "enactment by the Congress at any future time of legislation consistent with this application *governing the United States part* of any project for the development and utilization of the United States share of the waters of the International Rapids section of the St. Lawrence River." (Emphasis supplied.)

Thus it was that the Federal Power Commission order of July 15, 1953, included Article 18, which reads:

"The terms and conditions expressly set forth in the license shall not be construed as impairing any terms and conditions of the Federal Power Act which are not expressly set forth herein."

And Article 19 of that same order completed the chain of international agreement, legislative pronouncement, and procedural circumstance by directly setting forth that:

"In the design, construction, maintenance and operation of the project covered by this license, the Licensee shall comply with all applicable provisions and requirements of the Order of Approval (International Joint Commission Docket 68) issued October 29, 1952, by the International Joint Commission to the Governments of the United States and Canada for the construction of certain works for the development of power in the International Rapids Section of the St. Lawrence River."

Petitioners' argument therefore falls, particularly in the face of Congressional recognition of the integrated whole, which is so clearly evinced by the amendatory act of August 15, 1953, supra.

▮▮▮ Petitioners urge that the New York Power Authority has no authority under its enabling act to seek or receive the license in question. They say the State of New York has never released any of its sovereign or proprietary rights and therefore the United States could not recover under Section 14 from the Power Authority. Doubts on this point having been expressed by the Trial Examiner of the Commission in 1949, the New York statute was amended in 1951 [16] to make the matter certain. The statute as amended specifically authorizes the Power Authority to apply for licenses from the Federal Power Commission and mentions the St. Lawrence River in that connection. The statute contains a specific reservation of the rights of New York, but the same sentence includes a proviso which reads as follows:

"* * * provided, however, that nothing herein contained shall be construed as limiting the power of the authority to accept a license issued by the federal power commission pursuant to the provisions of the federal power act, as amended, and the terms and conditions therein imposed pursuant to law."

It is thus amply clear that the legislature of the State of New York specifically authorized its Power Authority to agree to the terms and conditions of a federal license "pursuant to the provisions of the federal power act," and in so doing cannot be supposed to have overlooked so striking a condition as the one spelled out in Section 14.

Petitioner Lake Ontario Land Development and Beach Protection Association, Inc., is an association composed of homeowners whose properties border on Lake Ontario. They say that the construction of the Iroquois Dam will raise the level of the water in Lake Ontario to such a point that in stormy weather

16. Laws of N.Y. c. 146, § 1005(3) (1951).

their properties will be damaged. There is a dispute as to whether the project works to be constructed under the license will or will not increase the water levels in Lake Ontario. However that may be, the matter was submitted to the International Joint Commission and was determined by it, and, moreover, a further study of the matter is under way in a pending proceeding before that Commission. In approving the international aspects of the project the Joint Commission required that all interests injured be given "suitable and adequate protection and indemnity in accordance with the laws in Canada or the Constitution and laws in the United States respectively." Moreover Section 10(c) of the Federal Power Act [17] provides that each licensee shall be liable for all damages occasioned to the property of others.

Petitioner Public Power and Water Corporation contends that the Power Commission disregarded factors essential to national defense. It also contends that the Power Commission erred in permitting the government of Canada to intervene in the proceeding to maintain that the Power Authority of New York alone was a suitable licensee. We find these contentions not well taken.[18]

We find no violations of the requirements of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq.

Contentions are made by respondent and intervenors concerning the standings of the several petitioners to bring these appeals.[19] However, since we take the views above expressed upon the basic controversy, we may assume for present purposes, without deciding, that, as petitioners were parties in the proceedings before the Commission, their petitions to review the resulting order may be entertained.

Affirmed.

17. 41 Stat. 1068 (1920), 49 Stat. 842 (1935), 16 U.S.C.A. § 803(c).

18. See Sen.Rep.No.441, 83d Cong., 1st Sess. 25–26 (1953).

19. Cf. Sec. 7(a) of the Federal Power Act, 41 Stat. 1067 (1920), as amended, 16 U.S.C.A. § 800.