Commonwealth *v.* Smith, Appellant.

Argued May 23, 1949. Before MAXEY, C. J., LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Herbert S. Levin,* with him *Harry M. Berkowitz,* for appellant.

*Colbert C. McClain,* Assistant District Attorney, with him *John H. Maurer,* District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, June 24, 1949:

This is an appeal based upon alleged abuse of discretion by the court below in imposing the death penalty after appellant's plea of guilty of murder. James Smith pleaded guilty to an indictment charging him with the murder of John J. Haines on September 21, 1948, in Philadelphia. On the same day he was adjudged guilty of murder in the first degree by the court en banc, composed of Judges CHARLES L. GUERIN, JOSEPH SLOANE and VINCENT A. CARROLL.

The victim, John J. Haines, was a taxicab driver. He was found shot through the back of his head, slumped on the front seat of his cab, bleeding, shortly after midnight, on January 15, 1948, on Delaware Avenue near South Street, Philadelphia. Edward G. Gundaker, Jr., was operating a tow truck in the vicinity when he saw appellant emerging from the cab, apprehended him, and turned him over to the police. Appellant admitted that he had shot Haines and signed a statement admit-

ting that the gun he used in the killing was one he had obtained in a robbery in Camden, New Jersey; that around midnight on January 14th he determined to rob someone, hailed a cab and, later, intending to rob the driver, shot and killed him. When he was asked: "When you told the cab driver that it was a holdup, did the cab driver say anything to you?" Smith answered: "No, sir. I had the gun pointed at him. He didn't say anything."

The defense called as a witness Dr. Fred Adams, a New York psychiatrist, connected with the Kings County Hospital, Kings County, New York. He testified that during May or June, 1945, at the request of the Kings County Court, he and Dr. Gladys McDermaid, also a psychiatrist, examined appellant and diagnosed him as "psychosis. Schizophrenia. Hebephrenic type"; that this type of schizophrenia is a "mental disturbance characterized usually by illusions, delusions, hallucinations referable to the idea of persecution or grandeur"; that this diagnosis was aided by the findings of a psychologist, Dr. Samuel Machover. On the basis of these findings, they submitted to the Court that appellant was "presently insane, not imbecile and is not capable of understanding the charge against him, the proceedings against him and of making his defense". Defendant was then committed by the Court to the Brooklyn State Hospital for treatment of his mental condition. When questioned by the court Dr. Adams testified that when examined in 1945 the appellant did not know the difference between right and wrong.

Dr. Bellinger was also called by appellant. He is the Senior Director of Brooklyn State Hospital, in Brooklyn, New York. He testified that hospital psychiatrists examined the appellant and substantially confirmed the previous diagnosis, except that they concluded the type to be catatonic rather than hebephrenic. Dr. Bellinger stated that appellant was detained until

October 11, 1945, "when he was discharged to the Department of Correction of the City of New York after I had personally examined him and found him to be, in my opinion, sane and capable of understanding the charges pending against him and of conferring with counsel in the making of his defense [for stealing an automobile]. I reported of record that I examined this young man myself on the 9th of October and I certified to the Committing Judge and the District Attorney of Kings County the fact that he had recovered to the extent that he was able to confer with counsel, understand the nature of the charges against him, and he was discharged to the Department of Correction as having recovered from any mental illness which he had. He was clear and lucid." Dr. Bellinger also stated that appellant, when discharged on October 11, 1945, "was cured and knew the difference between right and wrong".

By agreement and order of the Trial Court, a letter from the Philadelphia General Hospital was received in evidence. It refers to appellant's admission to the Psychopathic Department in December 1945. This letter, dated April 28, 1948, which is signed by Dr. Albert J. Kaplan, Assistant Chief of Neuropsychiatric Department, says James Smith (this appellant) "was admitted in an acutely hallucinatory state following excessive indulgence in alcohol the day prior to admission." The letter states that: "His past history reveals that he was in the Army from 6-26-41 to 6-29-44, and he was discharged for medical reasons (probably nervousness; actual cause unknown). He had served overseas in the C. B. I. theatre of operation, was a Staff Sergeant twice but was demoted because of insubordination. While overseas he was hospitalized twice because of 'nervous observation' for a nervous condition and three times for malaria." The letter continues: "When first examined in this hospital, there was no evidence of hallucina-

tions. Patient was well oriented and seemed to have a fair amount of insight. He was coöperative and apparently did not appear acutely ill." The letter refers to a note by the Assistant Chief of Service, Dr. A. Leanman, which has the following comments: "Patient has heard two voices since 1943; one tells him to 'do good' and the other tells him to 'do bad'. He has amnesia periods when he finds himself in different parts of town at which time he wants to hurt someone (admission note says he is homicidal). He gets into fights easily. He states he was in the Army for three years, overseas two years, got into minimum trouble. Recently released from Brooklyn State Hospital for 'same thing; they said I took an automobile but I don't remember it.'"

At the request of Judge GUERIN the defendant had been examined a few days before November 5, 1948, by Dr. William Drayton, Jr., and his testimony is as follows: "The guard in number four block at the Holmesburg Prison told me, over the telephone, that he acts in a normal manner, is pleasant and coöperative. Smith has a convenient memory loss. He shows no evidence of having any psychosis at this time, nor do I believe that he was psychotic when he shot and killed John J. Haines. . . ." When Dr. Drayton was asked: "What is your diagnosis?", he answered: "He is of average intelligence, no psychosis; psychotically and neurologically negative." Dr. Drayton said that as far as he could tell the defendant had completely recovered from any mental illness of which there had been any prior history. He was asked: "At the time you examined him did he appreciate the difference between right and wrong?" His reply was: "He answered my question, 'What happens to a person who kills,' life for life. He said wrong to kill and he said he didn't kill anybody." When asked: "Would you say this man when he says he hears voices is a faker?", he replied: "I think he is a faker." When asked: "You are not quite entirely

convinced that this man is sane?", he replied: "I believe that he is sane." Judge CARROLL asked Dr. Drayton the following question: "In your professional opinion was this man, on January 15, 1948, capable of distinguishing between right and wrong?" He replied: "I believe he was."

The court in its opinion in this case said, inter alia: "Defendant's counsel concede that the offense was murder of the first degree, but contend that a life sentence rather than death is warranted. In support of their position, they cite defendant's 'mental history and his childhood buffetings and waywardness,' and urge upon the court that if defendant was legally sane, he was mentally unhealthy and unstable. This contention completely overlooks the facts immediately preceding and leading up to the killing and defendant's arrest. There was nothing wrong with defendant's mental processes when he armed himself with the revolver and cartridges the night before he murdered Haines, with the intention as he confessed of holding up someone, because he needed money. He went to his friend's house and fixed her bed, and rested there awhile before setting out on his nefarious path which led to the cab driver's death. His mind was sufficiently acute for him to direct Haines to Delaware Avenue, probably one of the quietest and most deserted spots in Philadelphia at midnight. He was alert enough to fire one shot in the back of the head, destroying the brain, making it improbable that it would arouse any who might by chance be passing by. He waited until the cab had slowed to 5 to 10 miles per hour, so that it would be a simple matter for him to climb into the front seat, turn off the ignition and bring the cab to a complete stop. Had it not been for the unexpected but timely presence almost immediately of Gundaker and Magen, he might have completed his murderous act and robbery and perhaps never have been brought to justice. He was quick to recognize the

futility of attempting to escape when he saw the tire wrench in Gundaker's hand, and was sharp enough to drop five bullets back of the seat of the police car. When questioned immediately at the scene of his crime, his mind was keen enough first to blame the killing upon a fictitious unknown companion who had escaped, and he admitted seeing the police officer pick the revolver from the cab seat using a handkerchief to do so."

The court then said: "We are strengthened in our belief that defendant was fully aware of the nature of his act by the opinion of Dr. Drayton that he now shows no evidence of psychosis, nor was he psychotic when he shot Haines, but was capable of distinguishing between right and wrong, and of understanding what he was doing. More than two years elapsed after defendant's discharge from the Brooklyn State Hospital as recovered, and it was just about two years after he had himself committed to the Philadelphia General Hospital for alcoholic hallucinosis, that he committed this crime. There is no evidence of institutional or medical treatment in this time, nor is there anything in the record to indicate the need thereof. At two hearings before this court, defendant was quiet, attentive and coöperative. As we have pointed out above, when asked to bare his arm for Dr. Bellinger, he instantly obeyed the instruction of counsel, stood, removed his coat, raised his sleeve, and resumed his seat after identification was made by Dr. Bellinger." The court concluded with this statement: "We have determined the crime to be murder of the first degree, and, in the exercise of our discretion, have imposed sentence of death."

We find no abuse of discretion in this case. The judgment is affirmed and the record is remitted to the court below so that the sentence imposed may be carried out.