## UNITED STATES ex rel. SMITH v. WARDEN OF PHILADELPHIA COUNTY PRISON et al.

### No. 1334.

United States District Court
E. D. Pennsylvania.

Nov. 9, 1949.

Thomas D. McBride, Philadelphia, Pa., Herbert S. Levin, Philadelphia, Pa., Harry M. Berkowitz, Philadelphia, Pa., for petitioner.

T. McKeen Chidsey, Attorney General of Pennsylvania, Randolph C. Ryder, Deputy Attorney General of Pennsylvania, Ralph B. Umsted, Deputy Attorney General of Pennsylvania, James W. Tracey, Jr., Assistant District Attorney, of Philadelphia, Pa., Colbert C. McClain, Assistant District Attorney, of Philadelphia, Pa., for respondent.

Before KIRKPATRICK, Chief Judge, and WELSH, BARD, GANEY and Mc-GRANERY, District Judges.

KIRKPATRICK, Chief Judge.

This writ must be discharged for the reason that we have no jurisdiction.

The United States Code, 28 U.S.C.A. § 2241, gives power to the judges of the District Courts to grant writs of habeas corpus only "within their respective jurisdictions" and the decision of the Supreme Court of the United States in Ahrens v. Clark, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898, puts it beyond all question that unless the person confined is within the territorial jurisdiction of the District Court at the time the suit is instituted the court has no power to issue the writ.

The statute provides that application for a writ of habeas corpus must be by a written petition sworn to by the person confined or some one acting in his behalf, 28 U.S.C.A. § 2242. Until this is done no suit has been instituted.

In the present case the record shows without dispute that Smith arrived at the Western Penitentiary not earlier than 12:58 p.m. on Saturday, September 24. (All hours mentioned herein are Daylight Saving Time). Since it is 104 miles from the western limit of this judicial district to the Penitentiary, to which he was being transported by automobile, he must have been outside the district at 12:45 at which time the writ was actually issued.

Prior to that time the following had transpired:

At about 9:15 o'clock on the evening of Friday, September 23, counsel for the relator called Judge Welsh at his home by telephone and, after a conversation of 10 or 15 minutes in which counsel outlined his case, the Judge said "I will issue that writ to stay that execution if you make out a prima facie case tomorrow in conformity with what you say".

At 7:38 a.m. on Saturday the 24th the relator left the Eastern Penitentiary, in custody, bound for Rockview where he was to be executed immediately after midnight Sunday. There is no evidence that his removal at that hour was for the purpose of defeating the jurisdiction of this court or that those in charge of him had any knowledge that any steps were being taken by anyone to obtain a writ. The statement of the District Attorney of Philadelphia

County, who, with the Attorney General of Pennsylvania, represents the respondent in these proceedings, to the effect that he had no notice before 10:00 a.m. on Saturday that any application would be made, is not challenged and may be accepted as true.

Judge Welsh sat at about 12:00 o'clock on Saturday. At that time the relator must have been already outside the jurisdiction of this court, since he was travelling by automobile and could not have covered the 104 miles of road from the limits of the Eastern District to the Western Penitentiary in 58 minutes. Present were the relator's counsel and the First Assistant District Attorney of Philadelphia County, also the United States Attorney, who had been notified of the proceedings but who took no part in them. No written and verified petition was presented and no witness called. After statements by counsel and a discussion, followed by a slight delay in preparation of the papers, Judge Welsh issued the writ at 12:45.

It seems plain that up to noon on Saturday, and in fact up to the actual issuance of the writ, nothing had occurred which could by any possibility constitute the institution of a suit for habeas corpus. The only contact which the relator's attorney had had with the Court was a telephone conversation with one of the judges, in which he outlined his case. Thus, the matter is not procedural or technical but goes to the jurisdiction of the court and its right to act at all in this case.

Although the Attorney General did not waive the jurisdiction either expressly or impliedly by his presence in court, I question whether it would have made any difference if he had. The Supreme Court decided in Ahrens v. Clark, supra, that the restriction is one which Congress has placed on the power of the District Court to act and may not be waived by the parties. Nor can jurisdiction be conferred retroactively by the fact that the relator has been brought into this District by the state authorities who deemed it more seemly to comply with the writ than to defy it. This was decided by the Circuit Court of Appeals for this circuit in United States ex rel. Belardi v. Day, 3 Cir., 50 F.2d 816.

The writ is discharged and the relator is remanded to custody.

BARD, GANEY and McGRANERY, JJ., concur.

BARD, District Judge.

I concur in the opinion of the Chief Judge that the writ should be dismissed because the relator was not confined within the territorial jurisdiction of this Court at the time the suit was instituted.

It appears that all parties at the original hearing understood that the relator was no longer in this district since the order issued to produce the relator was directed only to the Warden of the Western State Penitentiary, a resident of the Middle District, who had custody of the relator.

Jurisdiction is basic and fundamental— not inconsequential as suggested by the dissenting opinion.

However, I am not unmindful of the fact that this great freedom writ, in the words of Mr. Justice Douglas, is "* * * one of the basic safeguards of personal liberty. * * * There is no room for niggardly restrictions when questions relating to its availability are raised. The statutes governing its use must be generously construed if the great office of the writ is not to be impaired." See concurring opinion Koki Hirota v. General of the Army MacArthur, 338 U.S. 197, 201, 69 S.Ct. 1238, 1239.

The relator was previously a resident of Philadelphia. The crime occurred in Philadelphia. His trial and principal place of confinement were in Philadelphia. Moreover, the respondent, in response to the writ, did bring the relator to the hearing in this district.

Because of these particular circumstances and in view of some observations adduced in the dissenting opinion, I deem it advisable to set forth other fundamental reasons that make mandatory the dismissal of the writ, even if proper jurisdiction existed.

The relator contends that he was denied the protection of the Fifth, Sixth and Fourteenth Amendments of the Constitution of the United States, in that he now is in dan-

ger of being deprived of his life in violation of due process of law.

The petition alleges that the relator is of unsound mind, that he was of unsound mind at the time of the commission of the crime, that he was of unsound mind at the time of the plea of guilty, and that he was of unsound mind at the time of the trial of his cause.

The petitioner, Herbert S. Levin, Esquire, one of two counsel for the relator, was originally retained by the relator's family. Upon arraignment, on February 25, 1948, and in the presence of counsel assigned by the court for that purpose only, the relator pleaded not guilty. Questioning the relator's mental capacity, relator's counsel requested the court of Oyer and Terminer on March 19, 1948 to appoint a commission under the Mental Health Act of 1923, as amended [1], to investigate into and report on the relator's sanity. On April 2, 1948 Judge Gerald F. Flood denied this petition on the grounds that the proper person had not, in accordance with the statute, made the request. No exception or appeal was taken from this denial, nor is it contended now that there was error in the court's ruling.

The relator could have had a trial on the sole question of sanity under the Act of 1860 [2], but no request was ever made.

The relator had the advice and counsel of two experienced, competent and skillful lawyers. In their presence and on their advice, the relator on September 21, 1948 changed his plea to "guilty generally", and was adjudged guilty of murder in the first degree.

It is true that the relator had been confined to a mental ward for nervous disorders while in the Army, and that he was committed by a New York criminal court order to the Brooklyn State Hospital on June 19, 1945 as insane. However, he was discharged from this institution as recovered on October 11, 1945, several years before the crime in question was committed. There existed therefore a presumption of sanity and the Commonwealth was not required to prove affirmatively the accused's mental capacity to commit the act. The law in Pennsylvania on this subject has been clearly delineated by two renowned jurists—the late Chief Justice Moschzisker of the Supreme Court and the late President Judge Keller of the Superior Court. Commonwealth v. Cilione, 293 Pa. 208, 142 A. 216; Commonwealth ex rel. Mulligan v. Smith, 156 Pa.Super. 469, 40 A. 2d 701.

It is also true that he was an alcoholic and on December 27, 1945 was admitted, of his own volition, to the Philadelphia General Hospital in an acutely hallucinatory state following excessive indulgence in alcohol the day prior to his admission. The hospital record, upon his discharge on January 4, 1946, listed the diagnosis of his case as Acute Alcoholic Hallucinosis.

This excursion into the realms of delirium tremens in no way rebutted the presumption of his sanity.

Under Pennsylvania law, a person who pleads and is adjudged guilty of murder in the first degree is subject to life imprisonment or the death sentence in the discretion of the trial court.[3] Upon counsel's request, the three trial Judges heard testimony in mitigation of the relator's sentence[4].

Upon counsel's motion, the Court appointed a psychiatrist to examine the relator [5], who was found to be sane and lucid and to know the difference between right and wrong at the time of the commission of the crime and at the hearing. The medical director of the Philadelphia County Prison characterized the relator as quiet, cooperative, lucid, oriented in all spheres,

1. Act of July 11, 1923, P.L. 998, Art. III, § 308, as amended by Act of May 28, 1937, P.L. 973, § 1, 50 P.S. § 48.

2. March 31, 1860, P.L. 427, § 67, 19 P.S. § 1352.

3. Act of June 24, 1939, P.L. 872, § 701, 18 P.S. § 4701.

4. Transcript of Record submitted to the Supreme Court of Pennsylvania, pp. 75a–76a.

5. Cf. Act of May 2, 1933, P.L. 224, § 1. et seq., 19 P.S. § 1153 et seq.

and in possession of insight into his predicament.

After hearing the testimony and reading the documentary evidence bearing on the relator's sanity, the three Judges imposed the death sentence on February 4, 1949.

I think the arraignment at which the relator changed his plea to guilty, the subsequent hearings, and the imposition of sentence, with skillful legal counsel present on every occasion, were all proper proceedings. These Judges had ample opportunity to observe the relator's actions and behavior at various times; they had the advice of a psychiatrist and of persons in contact with him during his confinement in prison. At no time did the relator or his counsel ask the Court to withdraw the plea of guilty. There was nothing in the record before them to indicate in law or in fact that the relator was at any relevant time legally insane so as to prevent the imposition of the death sentence.

What is there in the record to suggest that the three learned trial Judges did aught but discharge their responsible duties in a fair and orderly manner in strict conformity with the laws of Pennsylvania?

Defendant appealed to the Pennsylvania Supreme Court. His sole assignment of error was that the three Judges had abused their discretion by imposing the sentence of death instead of a sentence of life imprisonment. The Pennsylvania Supreme Court affirmed the conviction and sentence of the lower court on June 24, 1949. Commonwealth v. Smith, 362 Pa. 222, 66 A.2d 764.

From that date to this the relator and his counsel have made no effort to invoke any remedies available in the State Courts. They have presented no petition to the trial court or to the Supreme Court of Pennsylvania for a writ of habeas corpus to test any constitutional issues.

He has the right under the law of Pennsylvania to raise in the state courts the question he has here presented. The relator therefore has not exhausted his state remedies. He has not shown absence of any available state corrective process, nor has he shown the existence of circumstances rendering such process ineffective to protect his rights. 28 U.S.C.A. § 2254; Limiting the Abuse of Habeas Corpus, 8 F.R.D. 171, 175–178.

Had this matter been presented to the Supreme Court of Pennsylvania and had the relator felt that due process had been denied him, he could then have petitioned for certiorari to the Supreme Court of the United States.

In Ex Parte Spencer, 1913, 228 U.S. 652, 33 S.Ct. 709, 57 L.Ed. 1010, the Supreme Court refused motions to file applications for writs of habeas corpus. The language of Mr. Justice McKenna, speaking for the court at pages 659, 660, of 228 U. S., at page 710 of 33 S.Ct. is pertinent:

"* * * Respondent opposes the contentions and urges besides that they have been adjudicated against petitioners, and that they are seeking to use habeas corpus as a writ of error to review and reverse the judgment of the courts of Pennsylvania. * * *

"Petitioners certainly had ample opportunity to avail themselves of the objections they make to the validity of the sentences. * * * And surely even a defendant in a criminal case cannot complain if, in the tribunals in which he is arraigned for crime, he has opportunity to deny the crime, require its proof, resist unjust or excessive punishment, and have a review of all rulings through the successive state tribunals, and finally in the ultimate court of review upon questions under the Constitution of the United States. This being a defendant's opportunity, we have declared many times that it would only be an exceptional case when we should interfere by habeas corpus with the course or final administration by the state courts of the criminal justice of a state.

"* * * If defenses may be omitted at trials, rights of review omitted, and yet availed of through habeas corpus, the whole course of criminal justice will be deranged, and, it may be, defeated. This is the practical result in the case at bar. * * *" (Emphasis supplied).

It is only in rare instances under the "special circumstances" doctrine of Wade

v. Mayo, 334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647, that the usual procedure of exhausting state remedies should be bypassed, and resort be made to the United States District Court. Cf. Lyle v. Stewart, D.C., 80 F.Supp. 167. We have been presented with no special circumstances that would justify the bypassing of the above procedure, and the Court of Appeals for this circuit in two recent decisions has charted the course for us to follow. Commonwealth of Pennsylvania ex rel. Billman v. Burke, 3 Cir., 170 F.2d 413; Application of Baer et al., 3 Cir., 169 F.2d 770. To hold otherwise would make this Court an appellate court, over and above the Pennsylvania Supreme Court, to whom a last minute appeal could be taken, for purposes of delay, whenever any defendant would allege that he had been denied due process by the state courts of Pennsylvania because of his own failure to raise a constitutional issue in the state courts. I can conceive of nothing that would contribute more to thwart the orderly administration of justice, than to condone such a course.

In Sanderlin v. Smyth, 4 Cir., 1943, 138 F.2d 729 where the relator, who had been represented by able and experienced counsel, was convicted of murder, which judgment was affirmed by the highest state appellate court, Circuit Judge Parker, dismissing the petition for a writ of habeas corpus, 138 F.2d at pages 730-731 said:

"There has been some confusion of thought recently with regard to the right of persons imprisoned under judgments of state courts which they claim to have been obtained in violation of rights guaranteed by the Constitution of the United States to apply to the lower federal courts for release under habeas corpus. It may be useful, therefore, to summarize the rules which we understand to be applicable in such cases. They are:

"1. The writ of habeas corpus may not be used in such cases as an appeal or writ of error to review proceedings in the state court. * * * The judgment of the state court is ordinarily res adjudicata, not only of those issues which were raised and determined, but also of those which might have been raised. * * * Ordinarily, failure to raise a constitutional question during trial amounts to waiver thereof, United States ex rel. Jackson v. Brady, 4 Cir., 133 F.2d 476, 481; and only where failure to raise the question at the trial was due to ignorance, duress or other reason for which petitioner should not be held responsible, may resort be had to habeas corpus in the federal courts, and, even in these cases, only where it is made to appear that there has been such gross violation of constitutional right as to deny to the prisoner the substance of a fair trial and thus oust the court of jurisdiction to impose sentence. * * *

"2. The federal court should not issue the writ, even in the extraordinary cases above indicated, unless it is made to appear that petitioner has no adequate remedy in the state courts. If he has such remedy by habeas corpus, writ of error coram nobis or otherwise, he must pursue it, and can have the writ from the federal courts only after all state remedies have been exhausted."

The Federal Courts are always open and have a duty to protect the civil rights and constitutional guarantees of individuals. The Supreme Court, to the delight of law abiding citizens, has in recent years been especially vigilant and alert to safeguard the liberties of defendants in criminal cases who have been forced to stand trial or to plead guilty without the aid of counsel to represent them, or have been subjected to inhuman police pressure for the purpose of eliciting a confession, or have been denied the opportunity to present their defense in a constitutional manner. The instant case is not that type case, and should not be confused with that type case.

There was no violation of any due process by any of the State Courts in this case. With such a record before them courts also have a duty to protect society and to refrain from doing anything that will interfere with the just punishment of a brutal murderer.

WELSH, District Judge.

This case raises very important questions arising under the guarantee of the

due process clause of the Constitution of the United States and the Bill of Rights. Its dramatic features were inherent in the case itself. A young Negro, 23 years of age, was awaiting execution. Inasmuch as I personally had direct contact with some parts of that drama, and in consequence of the fact that Appellate Courts in questions of this nature are governed largely by the facts of each particular case, it is necessary for me to outline with considerable detail the various steps that were taken. This will account for the frequent use of the personal pronoun "I" instead of the usual editorial "we".

The genesis and history of the entire matter is as follows:

On Friday evening, September 23, 1949, at about 9:15 o'clock p. m. (standard time) I was in my home in the Eastern District of Pennsylvania. I was informed that a lawyer wanted to come out to see me on a very important matter. I went to the telephone. The caller identified himself as Mr. Herbert S. Levin, counsel for James Smith. He said he wanted to lay before me a very urgent matter and would like to come out—a distance of approximately 20 miles from where he was speaking. Upon inquiry by me he said he desired the important Writ of Habeas Corpus. Upon being asked why he could not wait until Monday morning he told me that it was a matter of life and death as his client was to be electrocuted at three minutes after midnight Sunday night—a matter of about 50 hours. He said the shortness of the time and the intervening week-end made it impossible for him to establish the normal and usual contacts in the emergency. I was then the Motion Judge for the Federal Court of this District. I asked him to explain in detail the basis upon which he felt entitled to the Writ. He then outlined quite fully the essential facts as we now know them and I can say that from his own statements and his answers to my questions I had a very complete grasp of the principles underlying his request. .

He informed me that the Relator was then in the Eastern District of Pennsylvania. This was true, the Relator being at the Holmesburg Prison in Philadelphia. I told Mr. Levin that I would grant the Writ and in order that the question would not be entirely academic and of no practical effect that I would be obliged to stay the execution. I also advised him that I fixed the hour of 10 o'clock a.m. the next morning, Saturday, and for him to notify the representatives of both the Federal and State Governments. In consequence of this direction to him I was called up about one-half hour later by a representative of the United States Attorney's Office who asked me to fix the hearing for 11:30 or 12:00 o'clock because of the fact that Saturday was a Jewish Holiday and that he and his son were required to be in the Synagogue at 10 o'clock. I agreed to do so and shortly before 12 o'clock I sat on the Bench. Representatives of the State and the United States Governments were present as were also the attorneys for the Relator. After the opening of the Court I was informed by one of counsel for the Commonwealth of Pennsylvania that the Relator was not in this district and therefore this Court had no jurisdiction. The statement was made that the Relator had been removed from the Philadelphia County prison to Bellefonte, Pennsylvania, which is admittedly beyond the confines of the Eastern District. Later, it was established that he was taken from the prison in Philadelphia at 7:38 a. m., and arrived at Bellefonte at 12:58 p. m., Standard Time. The Relator in no way agreed to this removal nor was counsel contacted about it. I might say here that if I had not agreed to Mr. Kallick's request for delay so that he could attend his religious services the Writ would have been signed while the Relator was still in the District. There would then be no question of the geographical feature and the establishment of the merits of the case. Can a decision on a matter of life and death and the great boon of the Writ of Habeas Corpus rest on an element so trivial and inconsequential?

Counsel for Relator stated that he tried to communicate with the assistant district attorney who prosecuted the case but that he was out of the state. It was not until Saturday morning at about 10 o'clock that

he was able to contact the first assistant district attorney, with whom he conferred and who was present at the hearing on Saturday morning. If it be a question of primary importance as to what time in hours and minutes the Relator crossed the geographical line between the Eastern and Middle Districts of Pennsylvania I would say that the question has not been established. It has been stated that Bellefonte is about 100 miles over the line. There is no evidence as to what stops in transit were made, or when in hours and minutes the geographical line was crossed. The burden is upon the State to establish the fact as to what hour the line was crossed, if this be important. The hearing ended about 12:30. At 12:30 I announced formally from the Bench that I allowed the Writ and would stay the execution until the question was decided. I assumed that I had jurisdiction under the law to do so. A short time then elapsed to perfect the actual wording of the Order granting the Petition for Writ of Habeas Corpus and staying the execution of sentence of death. That must have been not later than 12:45 because I was in the Broad Street Station at 1:00 o'clock.

Counsel advised me that because of the haste necessary to notify persons interested and the round-up of associates in connection with the hearing he had not had time to reduce his Motion to writing. He called this phase of the question to my attention before entering the courtroom and asked permission to file Nunc Pro Tunc, which permission was granted. After the hearing parties agreed that the Court should fix a hearing on the whole subject for Tuesday, October 4, 1949. I asked my brother judges to sit with me in the case in order to constitute the full District Court Bench. I decided on a full Bench to get the benefit of the collective wisdom of my associates rather than to have the case decided on the opinion of a single judge. The hearing asked for was had, five judges were on the Bench and the hearing consumed practically all of the day.

We extended a further opportunity for the parties to present testimony and the hearing was fixed for Thursday, October 6, 1949. I alone presided at that hearing and it consumed a full day in the taking of testimony.

The above, in my judgment, is a faithful narrative of the events.

There are involved in the consideration of the case three major questions: (1) Did the Court have geographical jurisdiction? (2) Had the Relator exhausted all State remedies open to him? (3) Do the merits of the case call for relief? I shall take up these major questions in their order.

1. Did the Court have geographical jurisdiction?

Inasmuch as the Congress has legislated on the geographical jurisdiction in matters of Habeas Corpus it is admitted that unless there are circumstances coming within the expressed meaning of the Act, and decisions thereunder, the Writ of Habeas Corpus should be heard in the district where the Relator is confined. The question naturally arises "when does jurisdiction attach and what circumstances have weight in our consideration of the question?" It must be remembered that the Relator was in the jurisdiction when counsel orally petitioned the District Judge; that counsel had only a few hours before been advised of the refusal to commute the death sentence, and that while it is not proven it may be assumed that when the Writ actually issued that he may have been in Bellefonte.

The decisions of the Appellate Courts on the subject of Habeas Corpus have been very numerous in recent years. A careful study of the merits and facts of the individual cases decided reveals that the controlling purpose of the decisions is to protect the right of the citizen to obtain the relief provided by the Writ and to prevent the agencies of government from defeating the purpose of the Writ by removing a Relator to a distant district. The Appellate Courts are equally on the alert to protect the government from the inconvenience and embarrassment of transporting applicants for the Writ from places of confinement to the place of original jurisdiction. The facts in the leading case on this question of geographical jurisdiction

in which the hearing is required to be within the district of his imprisonment go to show that the district where the Writ was applied for never had jurisdiction of any phase of the case. This is particularly true in the case of Ahrens et al. v. Clark, Attorney General, 335 U.S. 188, 68 S.Ct. 1443, 92 L.Ed. 1898, decided June 21, 1948. The whole genesis of that case and everything relating thereto arose in New York. Application for the Writ of Habeas Corpus was made in the District of Columbia. The District of Columbia had nothing to do with the case and there was no reason, except an attempt to centralize authority in the Federal Courts of the District, why it should be heard there. The Supreme Court laid down the Rule that the Writ should issue where the defendant was confined. But even in that case the Supreme Court went no further than to say that "A federal district court is without jurisdiction to issue a writ of habeas corpus if the person detained is not within the territorial jurisdiction of the court *when the petition is filed.*" (Italics supplied.)

In reading the above case, Ahrens et al. v. Clark, supra, we must not lose sight of the fact that the Supreme Court in that very case restated the Rule that should apply in the instant case. They clearly preserve the doctrine of jurisdiction in the case of Ex Parte Mitsuye Endo, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243, decided December 18, 1944. We cannot refrain from again calling attention to the overpowering weight to be given to the circumstances of the case in deciding this question. This case of Mitsuye Endo is in every way similar to this case so far as the removal from the district is concerned. The Relator in that case was a Japanese woman, a citizen of the United States, removed forcibly and against her will, along with many others, to a distant part of the country. The true meaning in the Endo case can best be understood by quoting at some length the exact language of the Court as expressed by Mr. Justice Douglas. I do so because it is believed that the decision in the Endo case directly bears upon the case under consideration. The decision was unanimous, with concurring opinion by Mr. Justice Murphy and by our own then Mr. Justice Roberts. Quoting from page 304, of 323 U.S., page 219 of 65 S.Ct.:

"Second. The question remains whether the District Court has jurisdiction to grant the writ of habeas corpus because of the fact that while the case was pending in the Circuit Court of Appeals appellant was moved from the Tule Lake Relocation Center in the Northern District of California where she was originally detained to the Central Utah Relocation Center in a different district and circuit.

"That question is not colored by any purpose to effectuate a removal in evasion of the habeas corpus proceedings. It appears that appellant's removal to Utah was part of a general segregation program involving many of these people and was in no way related to this pending case. Moreover, there is no suggestion that there is no one within the jurisdiction of the District Court who is responsible for the detention of appellant and who would be an appropriate respondent. We are indeed advised by the Acting Secretary of the Interior that if the writ issues and is directed to the Secretary of the Interior or any official of the War Relocation Authority (including an assistant director whose office is at San Francisco, which is in the jurisdiction of the District Court), the corpus of appellant will be produced and the court's order complied with in all respects. Thus it would seem that the case is not moot.

"In United States ex rel. Innes v. Crystal, 319 U.S. 755, 63 S.Ct. 1164, 87 L.Ed. 1708, the relator challenged a judgment of court martial by habeas corpus. The District Court denied his petition and the Circuit Court of Appeals affirmed that order. After that decision and before his petition for certiorari was filed here, he was removed from the custody of the Army to a federal penitentiary in a different district and circuit. The sole respondent was the commanding officer. Only an order directed to the warden of the penitentiary could effectuate his discharge and the warden as well as the prisoner was outside the territorial jurisdiction of the District Court.

We therefore held the cause moot. There is no comparable situation here.

"The fact that no respondent was ever served with process or appeared in the proceedings is not important. The United States resists the issuance of a writ. A cause exists in that state of the proceedings and an appeal lies from denial of a writ without the appearance of a respondent. Ex parte Milligan, supra, 4 Wall. [2] page 112, 18 L.Ed. 281; Ex parte Quirin, 317 U.S. 1, 24, 63 S.Ct. 2, 9, 87 L.Ed. 3.

"Hence, so far as presently appears, the cause is not moot and the District Court has jurisdiction to act unless the physical presence of appellant in that district is essential.

"We need not decide whether the presence of the person detained within the territorial jurisdiction of the District Court is prerequisite to filing a petition for a writ of habeas corpus. See In re Boles, 8 Cir., 48 F. 75; Ex parte Gouyet, D.C., 175 F. 230, 233; United States [ex rel. Belardi] v. Day, 3 Cir., 50 F.2d 816, 817; United States [ex rel. Harrington] v. Schlotfeldt, 7 Cir., 136 F.2d 935, 940. But see Tippitt v. Wood, 70 U.S.App.D.C. 332, 140 F.2d 689, 693. We only hold that the District Court acquired jurisdiction in this case and that the removal of Mitsuye Endo did not cause it to lose jurisdiction where a person in whose custody she is remains within the district.

"There are expressions in some of the cases which indicate that the place of confinement must be within the court's territorial jurisdiction in order to enable it to issue the writ. See In re Boles, supra, 48 F. at page 76; Ex parte Gouyet, supra; United States [ex rel. Belardi] v. Day, supra; United States [ex rel. Harrington] v. Schlotfeldt, supra. But we are of the view that the court may act if there is a respondent within reach of its process who has custody of the petitioner. As Judge Cooley stated in In the Matter of Jackson, 15 Mich. 417, 439-440: 'The important fact to be observed in regard to the mode of procedure upon this writ is, that it is directed to, and served upon, not the person confined, but his jailer. It does not

reach the former except through the latter. The officer or person who serves it does not unbar the prison doors, and set the prisoner free, but the court relieves him by compelling the oppressor to release his constraint. The whole force of the writ is spent upon the respondent.' And see United States v. Davis, Fed. Cas. No. 14,926, 5 Cranch C.C. 622; Ex parte Fong Yim, D.C., 134 F. 938; Ex parte Ng Quong Ming, D.C., 135 F. 378, 379; Sanders v. Allen, 69 App.D.C. 307, 100 F.2d 717, 719; Rivers v. Mitchell, 57 Iowa 193, 195, 10 N.W. 626; People [ex rel. Billotti] v. New York Juvenile Asylum, 57 App.Div. 383, 384, 68 N.Y.S. 279; People [ex rel. Dunlap] v. New York [Juvenile] Asylum, 58 App.Div. 133, 134, 68 N.Y.S. 656. The statute upon which the jurisdiction of the District Court in habeas corpus proceedings rests Rev.Stat. § 752, 28 U.S.C. § 452 [28 U.S.C.A. § 2241] gives it power 'to grant writs of habeas corpus for the purpose of an inquiry into the cause of restraint of liberty.' [26] That objective may be in no way impaired or defeated by the removal of the prisoner from the territorial jurisdiction of the District Court. That end may be served and the decree of the court made effective if a respondent who has custody of the prisoner is within reach of the court's process even though the prisoner has been removed from the district since the suit was begun.

"*The judgment is reversed* and the cause is remanded to the District Court for proceedings in conformity with this opinion." (Italics supplied.)

For further points on the broad principles governing issuance of the Writ see No. 61 Harvard Law Review, 1947-1948, 657-675, and pertinent authorities there cited.

To sum up my position I will put it this way. I consider, and still do consider, that when Mr. Levin consulted me on Friday night and laid this matter before me officially as a judge it was then placed before me for my decision and my jurisdiction immediately attached. It is true that *final* decision came later as I thought it fair to give all parties opportunity to be heard before making that final decision. But when I was consulted and found what the

essential principles were I then had to make a *preliminary* decision, which I did. I decided that Mr. Levin had shown a prima facie reason and good faith for his requesting that the Writ issue. Had either of those elements been lacking I would have refused to go further. But the appealing nature of the principles involved caused me to decide that I should go further. It is a well accepted principle, familiar to all judges and lawyers, that a judge is a judge in chambers as well as in court. A very great percentage of our actions in the discharge of our duties takes place in chambers. When an emergency exists and a judge is consulted as such anywhere in his district he has the power and duty to act to prevent irreparable injury which would be brought about by delay. In this case, the irreparable injury would have been the electric chair. My feeling is that a judge who would deny a hearing and fail to stay an execution under the facts presented to me, and the law relevant thereto, would have deserved the severest disapproval. Personally, if I had resolved all doubt on this very debatable question against a condemned man I would have been most unhappy for the rest of my life. Now that I have had an opportunity for diligent study I am still convinced that jurisdiction for the issuance of the Writ exists, both geographic and on the merits of the case.

I do not believe in splitting hairs in making basic decisions on the application of the Bill of Rights and the guarantees set up by the Constitution of the United States. To do so gives a great deal of aid and comfort to enemies both at home and abroad who like to point to some evidence that we give lip service to the Constitution but deny it in spirit. I do not claim that the Commonwealth deliberately removed Relator in order to defeat the jurisdiction of the Court. But I do know it was set up immediately as a ground for lack of jurisdiction. Future incidents may not be so apparently innocent. What has happened in the past can happen in the present and in the future. My own experience in an active life and the things that I have seen cause me to be constantly on the alert to safeguard our guarantees. I cannot divest myself of the effect that certain experiences in years long since past have upon me. I cannot overlook the fact that in some of the hotly contested elections arrests were made of active party workers of the opposing political party and the arrested persons taken from one station house to the other to avoid the service of a Writ of Habeas Corpus until the end of the polling day. Such experiences do not make me cynical but they cause me to feel that I should be very careful. Therefore, admitting as I do that apparently no improper purpose prompted the removal of the Relator while the proceedings were pending I feel that even to permit a good-faith removal to set up a geographic bar to jurisdiction would establish a precedent whereby at some future time a removal not in good faith, but a removal motivated by religious, racial, class or political hatred could destroy the very living soul of the Writ. I now pass to the 2nd question.

2. Had the Relator exhausted all State remedies open to him before making application for the Writ?

I am not in a position to say whether or not, had the electric chair not been imminent, there might or might not have been other State remedies open to him. But certainly when I was contacted on the Friday night in question there was no effective State aid open to him. The officials of the State evidently considered the State remedies at an end because the hour of execution had been fixed and we were told that certain physical preparations had already been made for the occasion. If the collective wisdom of my associates should lead them to feel that there are *now* other State remedies possible it would seem to me that the fair thing to do would be to hold our action here in abeyance and permit the Relator to try any proper or suggested State procedure. If he does that there will then be no question of the exhaustion of State remedies; we could then proceed to discuss the case on its merits.

We come now to a more debatable phase of the subject. A phase upon which there

may be a wide difference of viewpoint due to the difference in type existing among men. Just as out of the same soil in the garden will come forth myriad forms of flower and shrub just so from the same set of facts men of equal humanities, morals and understanding will come to different conclusions. I pay full respect to my associates and endow them with every virtue of heart and mind that I would like to claim for myself. If I differ from them it is because they are they and I am I. Now to the 3rd question.

3. Do the merits of the case call for relief?

Judgment cannot be passed on this phase of the case without a complete survey of the primary factors of the killing. The killing constituted a primitive, brutal taking of human life. The killer got into the cab, gave directions to the driver and at a favorable spot put a gun to the back of his head and blew his brains out. He was apprehended under such circumstances as to permit no doubt that he was the perpetrator. The fact of the killing, with robbery as a motive, stamped the case as undoubtedly under the Pennsylvania law one of murder in the first degree, punishable by death. That the Relator perpetrated the crime was admitted by counsel at every stage of the proceedings. The counsel in endeavoring to prepare for trial found certain abnormal characteristics in the Relator which caused them, as experienced attorneys, to believe he was suffering from a definite mental incapacity. At first they knew nothing of his background. They were at a loss to know just how to advise him because they could not establish an interchange of thought between them and their client. They then begain to inquire into his past history. They found out that he was 23 years of age, had gone to the 6th grade in school, had been in the military service and while there had been the subject of several mental investigations. They also found out that he had been committed to an institution for the criminally insane in the State of New York, against his will, after thorough investigation by competent State experts. This confinement lasted for five months. Upon his discharge there was a division of opinion among the medical experts as to whether he could be safely returned to society— some in the affirmative and some considered him not safe. They learned that after his discharge he returned to Philadelphia and approximately two months after his discharge from the New York mental institution he presented himself to the authorities of the Philadelphia General Hospital stating that he felt an urge to do violence and asked to be put away for safekeeping. (This was a very considerable length of time before the murder was committed.) Under the law of Pennsylvania a voluntary commitment cannot be made for more than ten days, at the expiration of which ten days he was discharged. A letter from the medical authorities of the institution outlined his ailments. There is no evidence that after his discharge from the New York mental institution or from the Philadelphia Hospital that any effort was ever made by the authorities of either State to check up on his actions or to take precautions to protect organized society from his known criminal mental condition as medically established by the New York State Medical Staff in any way. The history of the Relator's mental incapacity confirmed the suspicions that his attorneys had of his mentality. Having a responsible duty to their client they desired to obtain a thorough investigation of this phase of the Relator's status. The record shows just what steps were taken and how fruitless was every effort that they made. Every door at which they knocked in the State of New York to get these records before the entry of a plea of guilty was shut in their face. They then tried to have an examination made under the Mental Health Act of 1923 of Pennsylvania and petitioned the proper Court of Philadelphia County for that purpose. The very learned trial Judge found his hands tied by a decision of the Supreme Court of Pennsylvania which limited the right to apply for such an investigation to the Warden or Superintendent of the County Prison, or other person connected with the institution. Another Judge of the same Court, Quarter Sessions, Oyer and Terminer, made a per-

sonal appeal to the keeper of the County Prison to petition for such an investigation or Commission and it was refused. The keeper of that prison later testified on the stand and he said he refused because he considered Relator a faker. I refer my colleagues to that testimony for their information without comment. There was another proceeding open to them for an inquiry under the Act of 1860 of the State of Pennsylvania, but proceedings under this Act did not permit cross-examination of witnesses and counsel considered it wholly inadequate to accomplish their objective. I am of the same opinion. The type of mental malady is the same as that determined in the recent notorious case of Unruh in Camden, New Jersey and could not be established by neighbors and lay witnesses.

The appointed lawyers for the Relator were then in a dilemma, a dilemma that can be fully appreciated by those who have had experience in criminal law and practice. They were completely convinced of the Relator's mental incapacity to plead and they found themselves powerless to establish that incapacity. They knew he perpetrated the crime and said so. Their professional skill as counsel at law found no opportunity for serving their client in an endeavor to prove that he did not kill the victim while of full mental capacity and that he was of mental capacity to plead. They had no one who could assist them on that phase so when the arraignment was had they formally pleaded guilty. The defendant in Pennsylvania in a capital case is not bound by such plea. Whether this was a mistake on their part is not for me to say. They say they did so because, without having the financial means to obtain the assistance of some one in the medical profession, trained and experienced in mental diseases, they, as lawyers, could do absolutely nothing to present to the Court the ony question before it, namely, his mental condition at the time of the commission of the crime and at the time of his arraignment. If this were a case in which I was sitting as a judge and had to give findings of fact and conclusions of law I would find as a fact that the Re-

lator at the time of his arraignment and the entry of the plea and at the trial never had an opportunity to properly, fairly, and efficiently present evidence on this feature which was the only controlling element to decide the matter of life and death.

The question will be asked "what business is that of a Federal Court?" Counsel for Relator claim that it is the business of the Federal Court because the law of the State of Pennsylvania does not comply with the requirements of the Constitution of the United States as set forth in the Bill of Rights and the 14th Amendment. They claim that while it is true that the State did appoint counsel the law made no provision for them to acquire the information and assistance necessary to establish the true facts; that the Relator being without financial means could not engage the necessary medical assistance and therefore, in their belief, the word "counsel" should include this service

Again, the question will be asked "Is a State required under the Constitution of the United States to furnish medical assistance as well as legal counsel in all murder trials?" I think the answer will be no. But with a history of proven insanity dating back for some years before the murder, and mental illness showing up in the military service record, it seems to me that no fair arraignment and no fair trial could be given to a defendant under those circumstances without the defendant and his lawyers having the aid of the opinion of competent witnesses. Like the Israelites of old they can very well and properly say "we cannot make bricks without straw".

Reference was made at the hearing to Dr. Drayton's report. Dr. Drayton was not called in until after the plea was entered and then only as an aid to the Court for mitigation of penalty. His report was not on file and the attorneys for the Relator never saw it. When we are giving consideration to this phase of the case we must bear in mind the progressive features that have marked the decisions of our Supreme Court in connection with the right of counsel for defendants under the Constitutional guarantees. The progress made through the centuries on this

subject marks the progress and the high water mark of humanity in attaining liberty under law. Our present cherished right is a far cry from the old days in England when the defendant could not even testify in his own behalf. Down through the centuries brave men have waged a continuing battle against tyranny until that battle achieved its greatest victory in the form of our own Constitution. Even since the adoption of the Constitution we have marched steadily onward. The Supreme Court of the United States has been the battleground where has clashed the philosophy that would freeze and congeal that great document with the theory of those who would make it a living, growing tree of righteousness and knowledge. Under successive interpretations by wise judges of the high tribunal, whose functional continuity is most remarkable, the principles have been enunciated that even defendants who are poor and penniless are entitled to have counsel at the public expense. At first such counsel was limited to capital cases but even in my own time on the Bench it has been expanded so that today a defendant, no matter how poor and friendless, whether in a capital case or not, in a Federal Court, has a right to counsel. If he attempts to waive that right he can only do so after a thorough investigation and inquiry by the trial judge. This all goes to show the "counsel" is a relative and expanding term. In my judgment, a case such as the one before us, where the only question upon which hung the life and death of the Relator, was the mental condition of the accused and with a past history known to exist of criminal mental maladies, I think that the letter and spirit of the Constitutional guarantee would require the granting of the aid asked for by the Relator's attorneys.

We cannot close our eyes to the tremendous advances that have been made in the study of mental diseases. Granting that there may be over-optimistic claims made by doctors more enthusiastic than thorough, my experience in connection with one of the greatest hospitals leads me to appreciate and be thankful for the tremendous advances that have been made in pushing back the area of darkness that conceals the marvelous workings of the human mind. Mental science has filled the air with the means of transportation, of great explosives of tremendous power and we acclaim with pride our progress. But the science that strives to plumb the depths of that brain that has produced those wonders, what man is in his inner being, to explore, to understand the wonderful mechanism which enables him to live and move and function in a material world and at the same time reach out through his mental and intellectual endowment to the myriads of other worlds in his thoughts, and to the Creator of them all in his prayers—this science must be the mother of all science. To say that the aid of this science can be invoked only by persons with sufficient money to pay for it and denied to the penniless under circumstances that fairly indicate the need for a thorough inquiry into mental malady, would, in my opinion be a denial of the equal protection of the law and a breach of the Constitutional guarantee.[1]

---

1. There was handed up to me the third day of the hearing, at which I presided alone, a Bill which has been introduced into the last session of the legislature of the State of Pennsylvania and failed of enactment in the legislative jam incident to the closing days of the session. That Bill was introduced by Senator Lord on April 25, 1949 and is entitled "Criminal Procedure Code". It was prepared by the Joint State Government Commission. Among those who served on this Commission were Judge Gordon of the Philadelphia County; Judge Laub from Easton, Pennsylvania; Judge Woodring of North Hampton County, Mr. Justice Arnold of our Superior Court, Dean Hitschler of Dickinson School of Law, many district attorneys, and members of the Bar. Inasmuch as the Bill was not finally enacted into law I would not admit it into evidence. I was told and believe that there is no general opposition to the Bill and that the probabilities are that it will be passed at the next session. I cite it to show that Pennsylvania is aware of the present injustice with reference to mentally afflicted. If this bill had been enacted into law before the arraignment and trial this case would not now be before the Federal Courts because Section 1303, paragraphs

Supplemental Opinion.

This morning I read the concurring opinion of my brother judge, Judge Bard. I note that he states that "the relator was not confined within the territorial jurisdiction of this Court at the time the suit was instituted. It appears that all parties at the original hearing understood that the relator was no longer in this district since the order issued to produce the relator was directed only to the Warden of the Western State Penitentiary, a resident of the Middle District, who had custody of the relator."

The above phraseology would imply that the relator was not in the district when the suit was instituted. What constitutes the institution of the suit is the very question presented by this case. In order that there may be no confusion on this point I will quote from the statement of Attorney General Chidsey on Page 11: "I think we certainly ought to be able to agree upon the facts. I thought there would be no disagreement. At the time that the request for a hearing was made of Judge Welsh, *unquestionably the relator was within the jurisdiction of the District Court*. He was removed at seven or seven-thirty on Saturday morning and taken to Bellefonte, and he arrived there at 12:58 Standard Time, or 1:58 Daylight. The hearing here was at twelve, and the writ issued some time after 1 o'clock, but surely he was beyond Lancaster County, the westermost county in this district, at the time the writ issued." (Italics supplied.)

A and C of the proposed Bill read as follows:

"(a) The trial judge at any time after the indictment shall have power to require a mental examination "of the defendant and report thereon to be made by a psychiatrist employed by the State Department of Welfare or by a psychiatrist employed by any State Hospital or in any mental hospital maintained by the county. Such report when furnished to the judge shall be available to counsel for defendant and to the district attorney.

(c) If the report of the examination by the psychiatrist shows that the de-

fendant though not insane is so mentally ill or mentally deficient as to make it advisable for the welfare of the defendant or the protection of the community that he shall be committed to some institution other than the county prison, workhouse or a penitentiary, the trial judge shall have power to commit such defendant to any State or county institution, provided for the reception care treatment and maintenance of such cases or similar mental cases in lieu of a sentence to a county prison, workhouse or penitentiary and to direct the detaining of the defendant in such institution until further order of the court."